(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HAMILTON, CHAPTER 13 TRUSTEE *v.* LANNING

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 08–998.  Argued March 22, 2010—Decided June 7, 2010

Debtors filing for protection under Chapter 13 of the Bankruptcy Code
must agree to a court-approved plan under which they pay creditors
out of their future income.  If the bankruptcy trustee or an unsecured
creditor objects, a bankruptcy court may not approve the plan unless
it provides for the full repayment of unsecured claims or "provides
that all of the debtor's projected disposable income to be received"
over the plan's duration "will be applied to make payments" in accor-
dance with plan terms.  11 U. S. C. §1325(b)(1).  Before enactment of
the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005 (BAPCPA), the Code loosely defined "disposable income."
Though it did not define "projected disposable income," most bank-
ruptcy courts calculated it using a mechanical approach, multiplying
monthly income by the number of months in the plan and then de-
termining the "disposable" portion of the result.  In exceptional cases,
those courts also took into account foreseeable changes in a debtor's
income or expenses.  BAPCPA defines "disposable income" as "cur-
rent monthly income received by the debtor" less "amounts reasona-
bly necessary to be expended" for, *e.g.,* the debtor's maintenance and
support.  §1325(b)(2)(A)(i).  "Current monthly income," in turn, is cal-
culated by averaging the debtor's monthly income during a 6-month
look-back period preceding the petition's filing.  See §101(10A)(A)(i).
If a debtor's income is below the median for his or her State,
"amounts reasonably necessary" include the full amount needed for
"maintenance or support," see §1325(b)(2)(A)(i), but if the debtor's in-
come exceeds the state median, only certain specified expenses are
included, see §§707(b)(2), 1325(b)(3)(A).

A one-time buyout from respondent's former employer caused her
current monthly income for the six months preceding her Chapter 13

petition to exceed her State's median income. However, based on the income from her new job, which was below the state median, and her expenses, she reported a monthly disposable income of $149.03. She thus filed a plan that would have required her to pay $144 per month for 36 months. Petitioner, the Chapter 13 trustee, objected to confirmation of the plan because the proposed payment amount was less than the full amount of the claims against respondent, and because she had not committed all of her "projected disposable income" to repaying creditors. Petitioner claimed that the mechanical approach was the proper way to calculate projected disposable income, and that using that approach, respondent should pay $756 per month for 60 months. Her actual income was insufficient to make such payments.

The Bankruptcy Court endorsed a $144 payment over a 60-month period, concluding that "projected" requires courts to consider the debtor's actual income. The Tenth Circuit Bankruptcy Appellate Panel affirmed, as did the Tenth Circuit, which held that a court calculating "projected disposable income" should begin with the "presumption" that the figure yielded by the mechanical approach is correct, but that this figure may be rebutted by evidence of a substantial change in the debtor's circumstances.

*Held:* When a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation. Pp. 6–18.

(a) Respondent has the better interpretation of "projected disposable income." First, such a forward-looking approach is supported by the ordinary meaning of "projected." See *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187. In ordinary usage future occurrences are not "projected" based on the assumption that the past will necessarily repeat itself. While a projection takes past events into account, adjustments are often made based on other factors that may affect the outcome. Second, "projected" appears in many federal statutes, yet Congress rarely uses it to mean simple multiplication. See, *e.g.,* 7 U. S. C. §1301(b)(8)(B). By contrast, as the Bankruptcy Code shows, Congress can make its mandate of simple multiplication unambiguous—commonly using the term "multiplied." See, *e.g.*, 11 U. S. C. §1325(b)(3). Third, under pre-BAPCPA case law, the general rule was that courts would multiply a debtor's current monthly income by the number of months in the commitment period as the first step in determining projected disposable income, but would also have discretion to account for known or virtually certain changes in the debtor's income. This is significant, since the Court "will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure," *Travelers Casualty &*

Syllabus

*Surety Co. of America* v. *Pacific Gas & Elec. Co.*, 549 U. S. 443, 454, and Congress did not amend the term "projected disposable income" in 2005. Pp. 6–10.

(b) The mechanical approach also clashes with §1325's terms. First, §1325(b)(1)(B)'s reference to projected disposable income "to be received in the applicable commitment period" strongly favors the forward-looking approach. Because respondent would have far less than $756 per month in disposable income during the plan period, petitioner's projection does not accurately reflect disposable income "to be received." In such circumstances, the mechanical approach effectively reads that phrase out of the statute. Second, §1325(b)(1)'s direction to courts to determine projected disposable income "as of the effective date of the plan,"— *i.e.,* the confirmation date—is more consistent with the view that they are to consider postfiling information about a debtor's financial situation. Had Congress intended for projected disposable income to be no more than a multiple of disposable income, it could have specified the plan's *filing* date as the effective date. Third, §1325(b)(1)(B)'s requirement that projected disposable income "will be applied to make payments" is rendered a hollow command if, as of the plan's effective date, the debtor lacks the means to pay creditors in the calculated monthly amounts. Pp. 11–12.

(c) The arguments supporting the mechanical approach are unpersuasive. The claim that the Code's detailed and precise "disposable income" definition would have no purpose without the mechanical approach overlooks the important role that this statutory formula plays under the forward-looking approach, which begins with a disposable income calculation. The Tenth Circuit's rebuttable "presumption" analysis simply heeds the ordinary meaning of "projected." This Court rejects petitioner's argument that only the mechanical approach is consistent with §1129(a)(15)(B), which refers to "projected disposable income of the debtor (as defined in section 1325(b)(2))." And the Court declines to infer from the fact that §1325(b)(3) incorporates §707—which allows courts to consider "special circumstances," but only with respect to calculating expenses— that Congress intended to eliminate, *sub silentio*, the discretion that courts previously exercised to account for known or virtually certain changes. Pp. 12–14.

(d) Petitioner's proposed strategies for avoiding or mitigating the harsh results that the mechanical approach may produce for debtors—a debtor could delay filing a petition so as to place any extraordinary income outside the 6-month period; a debtor with unusually high income during that period could seek leave to delay filing a schedule of current income and ask the bankruptcy court to select a

Syllabus

6-month period more representative of the debtor's future disposable income; a debtor could dismiss the petition and refile at a later, more favorable date; and respondent might have been able to obtain relief by filing under Chapter 7 or converting her Chapter 13 petition to one under Chapter 7—are all flawed. Pp. 14–18.

545 F. 3d 1269, affirmed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, THOMAS, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. SCALIA, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–998

JAN HAMILTON, CHAPTER 13 TRUSTEE, PETITIONER *v.* STEPHANIE KAY LANNING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 7, 2010]

JUSTICE ALITO delivered the opinion of the Court.

Chapter 13 of the Bankruptcy Code provides bankruptcy protection to "individual[s] with regular income" whose debts fall within statutory limits. 11 U. S. C. §§101(30), 109(e). Unlike debtors who file under Chapter 7 and must liquidate their nonexempt assets in order to pay creditors, see §§704(a)(1), 726, Chapter 13 debtors are permitted to keep their property, but they must agree to a court-approved plan under which they pay creditors out of their future income, see §§1306(b), 1321, 1322(a)(1), 1328(a). A bankruptcy trustee oversees the filing and execution of a Chapter 13 debtor's plan. §1322(a)(1); see also 28 U. S. C. §586(a)(3).

Section 1325 of Title 11 specifies circumstances under which a bankruptcy court "shall" and "may not" confirm a plan. §1325(a),(b). If an unsecured creditor or the bankruptcy trustee objects to confirmation, §1325(b)(1) requires the debtor either to pay unsecured creditors in full or to pay all "projected disposable income" to be received by the debtor over the duration of the plan.

We granted certiorari to decide how a bankruptcy court should calculate a debtor's "projected disposable income." Some lower courts have taken what the parties term the "mechanical approach," while most have adopted what has been called the "forward-looking approach." We hold that the "forward-looking approach" is correct.

## I

As previously noted, §1325 provides that if a trustee or an unsecured creditor objects to a Chapter 13 debtor's plan, a bankruptcy court may not approve the plan unless it provides for the full repayment of unsecured claims or "provides that all of the debtor's projected disposable income to be received" over the duration of the plan "will be applied to make payments" in accordance with the terms of the plan. 11 U. S. C. §1325(b)(1); see also §1325(b)(1) (2000 ed.). Before the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), 119 Stat. 23, the Bankruptcy Code (Code) loosely defined "disposable income" as "income which is received by the debtor and which is not reasonably necessary to be expended" for the "maintenance or support of the debtor," for qualifying charitable contributions, or for business expenditures. §1325(b)(2)(A), (B).

The Code did not define the term "projected disposable income," and in most cases, bankruptcy courts used a mechanical approach in calculating projected disposable income. That is, they first multiplied monthly income by the number of months in the plan and then determined what portion of the result was "excess" or "disposable." See 2 K. Lundin, Chapter 13 Bankruptcy §164.1, p. 164–1, and n. 4 (3d ed. 2000) (hereinafter Lundin (2000 ed.)) (citing cases).

In exceptional cases, however, bankruptcy courts took into account foreseeable changes in a debtor's income or expenses. See *In re Heath*, 182 B. R. 557, 559–561

(Bkrtcy. App. Panel CA9 1995); *In re Richardson*, 283 B. R. 783, 799 (Bkrtcy. Ct. Kan. 2002); Tr. of Oral Arg. 7. Accord, 1 Lundin §35.10, at 35–14 (2000 ed.) ("The debtor should take some care to project estimated future income on Schedule I to include anticipated increases or decreases [in income] so that the schedule will be consistent with any evidence of income the debtor would offer at a contested confirmation hearing").

BAPCPA left the term "projected disposable income" undefined but specified in some detail how "disposable income" is to be calculated. "Disposable income" is now defined as "current monthly income received by the debtor" less "amounts reasonably necessary to be expended" for the debtor's maintenance and support, for qualifying charitable contributions, and for business expenditures. §1325(b)(2)(A)(i) and (ii) (2006 ed.). "Current monthly income," in turn, is calculated by averaging the debtor's monthly income during what the parties refer to as the 6-month look-back period, which generally consists of the six full months preceding the filing of the bankruptcy petition. See §101(10A)(A)(i).[1] The phrase "amounts reasonably necessary to be expended" in §1325(b)(2) is also newly defined. For a debtor whose income is below the median for his or her State, the phrase includes the full amount needed for "maintenance or support," see §1325(b)(2)(A)(i), but for a debtor with income that exceeds the state median, only certain specified expenses are included,[2] see §§707(b)(2), 1325(b)(3)(A).

_____

[1] However, if a debtor does not file the required schedule (Schedule I), the bankruptcy court may select a different 6-month period. See §101(10A)(A)(ii).

[2] The formula for above-median-income debtors is known as the "means test" and is reflected in a schedule (Form 22C) that a Chapter 13 debtor must file. See Fed. Rule Bkrtcy. Proc. Official Form 22C (2009); *In re Liverman*, 383 B. R. 604, 606, n. 1, 608–609 (Bkrtcy. Ct. NJ 2008).

## II
### A

Respondent had $36,793.36 in unsecured debt when she filed for Chapter 13 bankruptcy protection in October 2006. In the six months before her filing, she received a one-time buyout from her former employer, and this payment greatly inflated her gross income for April 2006 (to $11,990.03) and for May 2006 (to $15,356.42). App. 84, 107. As a result of these payments, respondent's current monthly income, as averaged from April through October 2006, was $5,343.70—a figure that exceeds the median income for a family of one in Kansas. See *id.*, at 78. Respondent's monthly expenses, calculated pursuant to §707(b)(2), were $4,228.71. *Id.*, at 83. She reported a monthly "disposable income" of $1,114.98 on Form 22C. *Ibid.*

On the form used for reporting monthly income (Schedule I), she reported income from her new job of $1,922 per month—which is below the state median. *Id.*, at 66; see also *id.*, at 78. On the form used for reporting monthly expenses (Schedule J), she reported actual monthly expenses of $1,772.97. *Id.*, at 68. Subtracting the Schedule J figure from the Schedule I figure resulted in monthly disposable income of $149.03.

Respondent filed a plan that would have required her to pay $144 per month for 36 months. See *id.*, at 93. Petitioner, a private Chapter 13 trustee, objected to confirmation of the plan because the amount respondent proposed to pay was less than the full amount of the claims against her, see §1325(b)(1)(A), and because, in petitioner's view, respondent was not committing all of her "projected disposable income" to the repayment of creditors, see §1325(b)(1)(B). According to petitioner, the proper way to calculate projected disposable income was simply to multiply disposable income, as calculated on Form 22C, by the number of months in the commitment period. Employing

this mechanical approach, petitioner calculated that creditors would be paid in full if respondent made monthly payments of $756 for a period of 60 months. *Id.*, at 108. There is no dispute that respondent's actual income was insufficient to make payments in that amount. Tr. of Oral Arg. 3–4.

## B

The Bankruptcy Court endorsed respondent's proposed monthly payment of $144 but required a 60-month plan period. No. 06–41037 etc., 2007 WL 1451999, *8 (Bkrtcy. Ct. Kan. 2007). The court agreed with the majority view that the word "projected" in §1325(b)(1)(B) requires courts "to consider at confirmation the debtor's *actual* income as it was reported on Schedule I." *Id.*, at *5 (emphasis added). This conclusion was warranted by the text of §1325(b)(1), the Bankruptcy Court reasoned, and was necessary to avoid the absurd result of denying bankruptcy protection to individuals with deteriorating finances in the six months before filing. *Ibid.*

Petitioner appealed to the Tenth Circuit Bankruptcy Appellate Panel, which affirmed. 380 B. R. 17, 19 (2007). The Panel noted that, although Congress redefined "disposable income" in 2005, it chose not to alter the preexisting term "projected disposable income." *Id.*, at 24. Thus, the Panel concluded, there was no reason to believe that Congress intended to alter the pre-BAPCPA practice under which bankruptcy courts determined projected disposable income by reference to Schedules I and J but considered other evidence when there was reason to believe that the schedules did not reflect a debtor's actual ability to pay. *Ibid.*

The Tenth Circuit affirmed. 545 F. 3d 1269, 1270 (2008). According to the Tenth Circuit, a court, in calculating "projected disposable income," should begin with the "presumption" that the figure yielded by the mechanical

approach is correct, but the Court concluded that this figure may be rebutted by evidence of a substantial change in the debtor's circumstances. *Id.*, at 1278–1279.

This petition followed, and we granted certiorari. 558 U. S. ___ (2009).

## III

### A

The parties differ sharply in their interpretation of §1325's reference to "projected disposable income." Petitioner, advocating the mechanical approach, contends that "projected disposable income" means past average monthly disposable income multiplied by the number of months in a debtor's plan. Respondent, who favors the forward-looking approach, agrees that the method outlined by petitioner should be determinative in most cases, but she argues that in exceptional cases, where significant changes in a debtor's financial circumstances are known or virtually certain, a bankruptcy court has discretion to make an appropriate adjustment. Respondent has the stronger argument.

First, respondent's argument is supported by the ordinary meaning of the term "projected." "When terms used in a statute are undefined, we give them their ordinary meaning." *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995). Here, the term "projected" is not defined, and in ordinary usage future occurrences are not "projected" based on the assumption that the past will necessarily repeat itself. For example, projections concerning a company's future sales or the future cash flow from a license take into account anticipated events that may change past trends. See, *e.g.*, *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U. S. 308, 316 (2007) (describing adjustments to "projected sales" in light of falling demand); *Innovair Aviation, Ltd.* v. *United States*, 83 Fed. Cl. 498, 502, 504–506 (2008) (calculating projected cash flow and noting that

past sales are "not necessarily the number of sales" that will be made in the future). On the night of an election, experts do not "project" the percentage of the votes that a candidate will receive by simply assuming that the candidate will get the same percentage as he or she won in the first few reporting precincts. And sports analysts do not project that a team's winning percentage at the end of a new season will be the same as the team's winning percentage last year or the team's winning percentage at the end of the first month of competition. While a projection takes past events into account, adjustments are often made based on other factors that may affect the final outcome. See *In re Kibbe*, 361 B. R. 302, 312, n. 9 (Bkrtcy. App. Panel CA1 2007) (contrasting "multiplied," which "requires only mathematical acumen," with "projected," which requires "mathematic acumen adjusted by deliberation and discretion").

Second, the word "projected" appears in many federal statutes, yet Congress rarely has used it to mean simple multiplication. For example, the Agricultural Adjustment Act of 1938 defined "projected national yield," "projected county yield," and "projected farm yield" as entailing historical averages "adjusted for abnormal weather conditions," "trends in yields," and "any significant changes in production practices." 7 U. S. C. §1301(b)(8)(B), (13)(J), (K).[3]

—————

[3] See also, *e.g.*, 8 U. S. C. §1364(a), (c)(2) (requiring the triennial immigration-impact report to include information "projected for the succeeding five-year period, based on reasonable estimates substantiated by the best available evidence"); 10 U. S. C. A. §2433a(a)(2)(B) (2010 Cum. Supp.) ("projected cost of completing the [defense acquisition] program based on reasonable modification of [current] requirements"); 15 U. S. C. §719c(c)(2) (2006 ed.) ("projected natural gas supply and demand"); 25 U. S. C. §2009(c)(1), (2) (requiring the Director of the Office of Indian Education Programs to submit an annual report containing certain projections and "a description of the methods and formulas used to calculate the amounts projected").

By contrast, we need look no further than the Bank-
ruptcy Code to see that when Congress wishes to mandate
simple multiplication, it does so unambiguously—most
commonly by using the term "multiplied."  See, *e.g.*, 11
U. S. C. §1325(b)(3) ("current monthly income, when mul-
tiplied by 12"); §§704(b)(2), 707(b)(6), (7)(A) (same);
§707(b)(2)(A)(i), (B)(iv) ("multiplied by 60").  Accord, 2
U. S. C. §58(b)(1)(B) ("multiplied by the number of months
in such year"); 5 U. S. C. §8415(a) ("multiplied by such
individual's total service"); 42 U. S. C. §403(f)(3) ("multi-
plied by the number of months in such year").

Third, pre-BAPCPA case law points in favor of the
"forward-looking" approach.  Prior to BAPCPA, the gen-
eral rule was that courts would multiply a debtor's current
monthly income by the number of months in the commit-
ment period as the first step in determining projected
disposable income.  See, *e.g.*, *In re Killough*, 900 F. 2d 61,
62–63 (CA5 1990) *(per curiam); In re Anderson,* 21 F. 3d
355, 357 (CA9 1994); *In re Solomon*, 67 F. 3d 1128, 1132
(CA4 1995).  See 2 Lundin §164.1, at 164–1 (2000 ed.)
("Most courts focus on the debtor's current income and
extend current income (and expenditures) over the life of
the plan to calculate projected disposable income").  But
courts also had discretion to account for known or virtu-
ally certain changes in the debtor's income.  See *Heath*,
182 B. R., at 559–561; *Richardson*, 283 B. R., at 799; *In re
James*, 260 B. R. 498, 514–515 (Bkrtcy. Ct. Idaho 2001);
*In re Jobe*, 197 B. R. 823, 826–827 (Bkrtcy. Ct. WD Tex.
1996); *In re Crompton*, 73 B. R. 800, 808 (Bkrtcy. Ct. ED
Pa. 1987); see also *In re Schyma*, 68 B. R. 52, 63 (Bkrtcy.
Ct. Minn. 1985) ("[T]he prospect of dividends . . . is not so
certain as to require Debtors or the Court to consider them
as regular or disposable income"); *In re Krull*, 54 B. R. 375,
378 (Bkrtcy. Ct. Colo. 1985) ("Since there are no changes
in income which can be clearly foreseen, the Court must
simply multiply the debtor's current disposable income by

36 in order to determine his 'projected' income").[4]    This judicial discretion was well documented in contemporary bankruptcy treatises.    See 8 Collier on Bankruptcy ¶1325.08[4][a], p. 1325–50 (15th ed. rev. 2004) (hereinafter Collier) ("As a practical matter, *unless there are changes which can be clearly foreseen*, the court must simply multiply the debtor's known monthly income by 36 and determine whether the amount to be paid under the plan equals or exceeds that amount" (emphasis added)); 3 W. Norton, Bankruptcy Law and Practice §75.10, p. 64 (1991) ("It has been held that the court should focus upon present monthly income and expenditures and, *absent extraordinary circumstances*, project these current amounts over the life of the plan to determine projected disposable income" (emphasis added)); 2 Lundin §164.1, at 164–28 to 164–31 (2000 ed.) (describing how reported decisions treated anticipated changes in income, particularly where such changes were "too speculative to be projected"); see also *In re Greer*, 388 B. R. 889, 892 (Bkrtcy.

––––––––––

[4] When pre-BAPCPA courts declined to make adjustments based on possible changes in a debtor's future income or expenses, they did so because the changes were not sufficiently foreseeable, not because they concluded that they lacked discretion to depart from a strictly mechanical approach. In *In re Solomon*, 67 F. 3d 1128 (1995), for example, the Fourth Circuit refused to make such an adjustment because it deemed disbursements from an individual retirement account during the plan period to be "speculative" and "hypothetical." *Id.*, at 1132. There is no reason to assume that the result would have been the same if future disbursements had been more assured. That was certainly true of *In re Killough*, 900 F. 2d 61 (1990), in which the Fifth Circuit declined to require inclusion of overtime pay in projected disposable income because it "was not definite enough." *Id.*, at 65; see also *id.*, at 66 ("[T]here may be instances where income obtained through working overtime can and should appropriately be included in a debtor's projected disposable income"). See also *Education Assistance Corp.* v. *Zellner*, 827 F. 2d 1222, 1226 (CA8 1987) (affirming bankruptcy court's exclusion of future tax returns and salary increases from debtor's projected disposable income because they were "speculative").

Ct. CD Ill. 2008) ("'As a practical matter, unless there are changes which can be clearly foreseen, the court must simply multiply the debtor's current monthly income by thirty-six'" (quoting 5 Collier ¶1325.08[4][a] (15th ed. rev. 1995))); *James*, *supra*, at 514 (same) (quoting 8 Collier ¶1325.08[4][a] (15th ed. rev. 2000)); *Crompton*, *supra*, at 808 (same) (citing 5 Collier ¶1325.08[4][a], [b], at 1325–47 to 1325–48 (15th ed. 1986)). Accord, 8 Collier ¶1325.08[4][b], at 1325–60 (15th ed. rev. 2007) ("As with the income side of the budget, the court must simply use the debtor's current expenses, *unless a change in them is virtually certain*" (emphasis added)). Indeed, petitioner concedes that courts possessed this discretion prior to BAPCPA. Tr. of Oral Arg. 7.

Pre-BAPCPA bankruptcy practice is telling because we "'will not read the Bankruptcy Code to erode past bankruptcy practice absent a clear indication that Congress intended such a departure.'" *Travelers Casualty & Surety Co. of America* v. *Pacific Gas & Elec. Co.*, 549 U. S. 443, 454 (2007); *Lamie* v. *United States Trustee*, 540 U. S. 526, 539 (2004); *Cohen* v. *de la Cruz*, 523 U. S. 213, 221 (1998); see also *Grogan* v. *Garner*, 498 U. S. 279, 290 (1991); *Kelly* v. *Robinson*, 479 U. S. 36, 47 (1986). Congress did not amend the term "projected disposable income" in 2005, and pre-BAPCPA bankruptcy practice reflected a widely acknowledged and well-documented view that courts may take into account known or virtually certain changes to debtors' income or expenses when projecting disposable income. In light of this historical practice, we would expect that, had Congress intended for "projected" to carry a specialized—and indeed, unusual—meaning in Chapter 13, Congress would have said so expressly. Cf., *e.g.*, 26 U. S. C. §279(c)(3)(A), (B) (expressly defining "projected earnings" as reflecting a 3-year historical average).

## B

The mechanical approach also clashes repeatedly with the terms of 11 U. S. C. §1325.

First, §1325(b)(1)(B)'s reference to projected disposable income "to be received in the applicable commitment period" strongly favors the forward-looking approach. There is no dispute that respondent would in fact receive far less than $756 per month in disposable income during the plan period, so petitioner's projection does not accurately reflect "income to be received" during that period. See *In re Nowlin*, 576 F. 3d 258, 263 (CA5 2009). The mechanical approach effectively reads this phrase out of the statute when a debtor's current disposable income is substantially higher than the income that the debtor predictably will receive during the plan period. See *Kawaauhau* v. *Geiger*, 523 U. S. 57, 62 (1998) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law" (internal quotation marks omitted)).

Second, §1325(b)(1) directs courts to determine projected disposable income "as of the effective date of the plan," which is the date on which the plan is confirmed and becomes binding, see §1327(a). Had Congress intended for projected disposable income to be nothing more than a multiple of disposable income in all cases, we see no reason why Congress would not have required courts to determine that value as of the *filing* date of the plan. See Fed. Rule Bkrtcy. Proc. 3015(b) (requiring that a plan be filed within 14 days of the filing of a petition), online at http://www.uscourts.gov/RulesAndPolicies/FederalRulema king/Overview/BankruptcyRules.aspx (all Internet materials as visited June 3, 2010, and available in Clerk of Court's case file). In the very next section of the Code, for example, Congress specified that a debtor shall commence payments "not later than 30 days after the *date of the filing of the plan*." §1326(a)(1) (emphasis added). Con-

gress' decision to require courts to measure projected disposable income "as of the *effective* date of the plan" is more consistent with the view that Congress expected courts to consider postfiling information about the debtor's financial circumstances. See 545 F. 3d, at 1279 ("[D]etermining whether or not a debtor has committed all projected disposable income to repayment of the unsecured creditors 'as of the effective date of the plan' suggests consideration of the debtor's actual financial circumstances as of the effective date of the plan").

Third, the requirement that projected disposable income "will be applied to make payments" is most naturally read to contemplate that the debtor will actually pay creditors in the calculated monthly amounts. §1325(b)(1)(B). But when, as of the effective date of a plan, the debtor lacks the means to do so, this language is rendered a hollow command.

C

The arguments advanced in favor of the mechanical approach are unpersuasive. Noting that the Code now provides a detailed and precise definition of "disposable income," proponents of the mechanical approach maintain that any departure from this method leaves that definition "'with no apparent purpose.'" *In re Kagenveama*, 541 F. 3d 868, 873 (CA9 2008). This argument overlooks the important role that the statutory formula for calculating "disposable income" plays under the forward-looking approach. As the Tenth Circuit recognized in this case, a court taking the forward-looking approach should begin by calculating disposable income, and in most cases, nothing more is required. It is only in unusual cases that a court may go further and take into account other known or virtually certain information about the debtor's future

income or expenses.[5]

Petitioner faults the Tenth Circuit for referring to a rebuttable "presumption" that the figure produced by the mechanical approach accurately represents a debtor's "projected disposable income." See 545 F. 3d, at 1278–1279. Petitioner notes that the Code makes no reference to any such presumption but that related Code provisions expressly create other rebuttable presumptions. See §707(b)(2)(A)(i) and (B)(i). He thus suggests that the Tenth Circuit improperly supplemented the text of the Code.

The Tenth Circuit's analysis, however, simply heeds the ordinary meaning of the term "projected." As noted, a person making a projection uses past occurrences as a starting point, and that is precisely what the Tenth Circuit prescribed. See, *e.g.*, *Nowlin*, *supra*, at 260, 263.

Petitioner argues that only the mechanical approach is consistent with §1129(a)(15)(B), which refers to "projected disposable income of the debtor (as defined in section 1325(b)(2))." This cross-reference, petitioner argues, shows that Congress intended for the term "projected disposable income" to incorporate, presumably in all contexts, the defined term "disposable income." It is evident that §1129(a)(15)(B) refers to the defined term "disposable income," see §1325(b)(2), but that fact offers no insight into the meaning of the word "projected" in §§1129(a)(15)(B) and 1325(b)(1)(B). We fail to see how that word acquires a specialized meaning as a result of this cross-reference—particularly where both §§1129(a)(15)(B) and 1325(b)(1)(B) refer to projected disposable income "to be received" during the relevant period. See *supra*, at 11.

---

[5] For the same reason, the phrase "[f]or purposes of this subsection" in §1325(b)(2) is not rendered superfluous by the forward-looking approach.

Petitioner also notes that §707 allows courts to take "special circumstances" into consideration, but that §1325(b)(3) incorporates §707 only with respect to calculating expenses. See *In re Wilson*, 397 B. R. 299, 314–315 (Bkrtcy. Ct. MDNC 2008). Thus, he argues, a "special circumstances" exception should not be inferred with respect to the debtor's income. We decline to infer from §1325's incorporation of §707 that Congress intended to eliminate, *sub silentio*, the discretion that courts previously exercised when projecting disposable income to account for known or virtually certain changes. Accord, *In re Liverman*, 383 B. R. 604, 613, and n. 15 (Bkrtcy. Ct. NJ 2008).

D

In cases in which a debtor's disposable income during the 6-month look-back period is either substantially lower or higher than the debtor's disposable income during the plan period, the mechanical approach would produce senseless results that we do not think Congress intended. In cases in which the debtor's disposable income is higher during the plan period, the mechanical approach would deny creditors payments that the debtor could easily make. And where, as in the present case, the debtor's disposable income during the plan period is substantially lower, the mechanical approach would deny the protection of Chapter 13 to debtors who meet the chapter's main eligibility requirements. Here, for example, respondent is an "individual whose income is sufficiently stable and regular" to allow her "to make payments under a plan," §101(30), and her debts fall below the limits set out in §109(e). But if the mechanical approach were used, she could not file a confirmable plan. Under §1325(a)(6), a plan cannot be confirmed unless "the debtor will be able to make all payments under the plan and comply with the plan." And as petitioner concedes, respondent could not

possibly make the payments that the mechanical approach prescribes.

In order to avoid or at least to mitigate the harsh results that the mechanical approach may produce for debtors, petitioner advances several possible escape strategies. He proposes no comparable strategies for creditors harmed by the mechanical approach, and in any event none of the maneuvers that he proposes for debtors is satisfactory.

1

Petitioner first suggests that a debtor may delay filing a petition so as to place any extraordinary income outside the 6-month look-back period. We see at least two problems with this proposal.

First, delay is often not a viable option for a debtor sliding into bankruptcy.

> "Potential Chapter 13 debtors typically find a lawyer's office when they are one step from financial Armageddon: There is a foreclosure sale of the debtor's home the next day; the debtor's only car was mysteriously repossessed in the dark of last night; a garnishment has reduced the debtor's take-home pay below the ordinary requirements of food and rent. Instantaneous relief is expected, if not necessary." K. Lundin & W. Brown, Chapter 13 Bankruptcy §3.1[2] (4th ed. rev.2009), http://www.ch13online.com/Subscriber/Chapter_13_ Bankruptcy_4th_Lundin_Brown.htm.

See also *id.*, §38.1 ("Debtor's counsel often has little discretion when to file the Chapter 13 case").

Second, even when a debtor is able to delay filing a petition, such delay could be risky if it gives the appearance of bad faith. See 11 U. S. C. §1325(a)(7) (requiring, as a condition of confirmation, that "the action of the debtor in filing the petition was in good faith"); see also,

*e.g.*, *In re Myers*, 491 F. 3d 120, 125 (CA3 2007) (citing "'the timing of the petition'" as a factor to be considered in assessing a debtor's compliance with the good-faith requirement). Accord, *Neufeld* v. *Freeman*, 794 F. 2d 149, 153 (CA4 1986) (a debtor's prepetition conduct may inform the court's good-faith inquiry).

2

Petitioner next argues that a debtor with unusually high income during the 6 months prior to the filing of a petition, could seek leave to delay filing a schedule of current income (Schedule I) and then ask the bankruptcy court to exercise its authority under §101(10A)(A)(ii) to select a 6-month period that is more representative of the debtor's future disposable income. We see little merit in this convoluted strategy. If the Code required the use of the mechanical approach in all cases, this strategy would improperly undermine what the Code demands. And if, as we believe, the Code does not insist upon rigid adherence to the mechanical approach in all cases, this strategy is not needed. In any event, even if this strategy were allowed, it would not help all debtors whose disposable income during the plan period is sharply lower than their previous disposable income.[6]

3

Petitioner suggests that a debtor can dismiss the petition and refile at a later, more favorable date. But petitioner offers only the tepid assurance that courts "generally" do not find this practice to be abusive. Brief for Petitioner 53. This questionable stratagem plainly circumvents the statutory limits on a court's ability to shift

––––––––––

[6] Under 11 U. S. C. §521(i)(3), a debtor seeking additional time to file a schedule of income must submit the request within 45 days after filing the petition, and the court may not grant an extension of more than 45 days.

the look-back period, see *supra*, at 16, and n. 6, and should give debtors pause.[7] Cf. *In re Glenn*, 288 B. R. 516, 520 (Bkrtcy. Ct. ED Tenn. 2002) (noting that courts should consider, among other factors, "whether this is the first or [a] subsequent filin[g]" when assessing a debtor's compliance with the good-faith requirement).

4

Petitioner argues that respondent might have been able to obtain relief by filing under Chapter 7 or by converting her Chapter 13 petition to one under Chapter 7. The availability of Chapter 7 to debtors like respondent who have above-median incomes is limited. In respondent's case, a presumption of abuse would attach under §707(b)(2)(A)(i) because her disposable income, "multiplied by 60," exceeds the amounts specified in subclauses (I) and (II). See also §707(b)(1) (allowing a court to dismiss a petition filed by a debtor "whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter"); App. 86–88 ("Notice to Individual Consumer Debtor under §342(b) of the Bankruptcy Code") ("If your income is greater than the median income for your state of residence and family size, in some cases, creditors have the right to file a motion requesting that the court dismiss your case under §707(b) of the Code"). Nevertheless, petitioner argues, respondent might have been able to overcome this presumption by claiming that her case involves "special circumstances" within the meaning of §707(b)(2)(B)(i). Section 707 identi-

───────────

[7] For example, a debtor otherwise eligible for Chapter 13 protection may become ineligible if "at any time in the preceding 180 days" "the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case," or "the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title." §109(g).

fies as examples of "special circumstances" a "serious medical condition or a call or order to active duty in the Armed Forces," *ibid.*, and petitioner directs us to no authority for the proposition that a prepetition decline in income would qualify as a "special circumstance." In any event, the "special circumstances" exception is available only to the extent that "there is no reasonable alternative," *ibid.*, a proposition we reject with our interpretation of §1325(b)(1) today.[8]

In sum, each of the strategies that petitioner identifies for mitigating the anomalous effects of the mechanical approach is flawed. There is no reason to think that Congress meant for any of these strategies to operate as a safety valve for the mechanical approach.

## IV

We find petitioner's remaining arguments unpersuasive. Consistent with the text of §1325 and pre-BAPCPA practice, we hold that when a bankruptcy court calculates a debtor's projected disposable income, the court may account for changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation. We therefore affirm the decision of the Court of Appeals.

*It is so ordered.*

---

[8] Petitioner also suggests that some Chapter 13 debtors may be able to plead "special circumstances" on the expense side of the calculation by virtue of BAPCPA's incorporation of the Chapter 7 means test into Chapter 13. See §707(b)(2)(B)(i), (ii). This is no help to debtors like respondent, whose income has changed but whose expenses are constant.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–998

_____

JAN HAMILTON, CHAPTER 13 TRUSTEE,
PETITIONER *v.* STEPHANIE KAY
LANNING

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 7, 2010]

JUSTICE SCALIA, dissenting.

The Bankruptcy Code requires a debtor seeking relief under Chapter 13, unless he will repay his unsecured creditors in full, to pay them all of his "projected disposable income" over the life of his repayment plan. 11 U. S. C. §1325(b)(1)(B). The Code provides a formula for "project[ing]" what a debtor's "disposable income" will be, which so far as his earnings are concerned turns only on his past income. The Court concludes that this formula should not apply in "exceptional cases" where "known or virtually certain" changes in the debtor's circumstances make it a poor predictor. *Ante*, at 6. Because that conclusion is contrary to the Code's text, I respectfully dissent.

## I

## A

A bankruptcy court cannot confirm a Chapter 13 plan over the objection of the trustee unless, as of the plan's effective date, either (A) the property to be distributed on account of the unsecured claim at issue exceeds its amount or (B) the "the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make

payments to unsecured creditors under the plan."
§1325(b)(1)(B). The Code does not define "projected dis-
posable income," but it does define "disposable income."
The next paragraph of §1325(b) provides that "[f]or pur-
poses of this subsection, the term 'disposable income'
means current monthly income received by the debtor,"
excluding certain payments received for child support,
"less amounts reasonably necessary to be expended" on
three categories of expenses. §1325(b)(2). The Code in
turn defines "current monthly income" as "the average
monthly income from all sources that the debtor re-
ceives . . . derived during the 6-month period ending on"
one of two dates.[1] §101(10A)(A). Whichever date applies,
a debtor's "current monthly income," and thus the income
component of his "disposable income," is a sum certain, a
rate fixed once for all based on historical figures.

This definition of "disposable income" applies to the use
of that term in the longer phrase "projected disposable
income" in §1325(b)(1)(B), since the definition says that it
applies to subsection (b). Cf. §1129(a)(15)(B) (referring to
"the projected disposable income of the debtor (as defined
in section 1325(b)(2))"). The puzzle is what to make of the
word "projected."

In the Court's view, this modifier makes all the differ-
ence. Projections, it explains, ordinarily account for later
developments, not just past data. *Ante*, at 6–7. Thus, the
Court concludes, in determining "projected disposable
income" a bankruptcy court may depart from §1325(b)(2)'s

---

[1] If the debtor files a schedule of current income, as ordinarily re-
quired by §521(a)(1)(B)(ii), then the 6-month period ends on the last
day of the month preceding the date the case is commenced,
§101(10A)(A)(i)—that is, when the petition is filed, §§301(a), 302(a),
303(b). If the debtor does not file such a schedule on time—which the
bankruptcy court apparently may excuse him from doing,
§521(a)(1)(B)(ii)—the 6-month period ends on the date the bankruptcy
court determines the debtor's current income. §101(10A)(A)(ii).

inflexible formula, at least in "exceptional cases," to account for "significant changes" in the debtor's circumstances, either actual or anticipated. *Ante*, at 6.

That interpretation runs aground because it either renders superfluous text Congress included or requires adding text Congress did not. It would be pointless to define disposable income in such detail, based on data during a specific 6-month period, if a court were free to set the resulting figure aside whenever it appears to be a poor predictor. And since "disposable income" appears nowhere else in §1325(b), then unless §1325(b)(2)'s definition applies to "projected disposable income" in §1325(b)(1)(B), it does not apply at all.

The Court insists its interpretation does not render §1325(b)(2)'s incorporation of "current monthly income" a nullity: A bankruptcy court must still *begin* with that figure, but is simply free to fiddle with it if a "significant" change in the debtor's circumstances is "known or virtually certain." *Ante*, at 6, 12. That construction conveniently avoids superfluity, but only by utterly abandoning the text the Court purports to construe. Nothing in the text supports treating the definition of disposable income Congress supplied as a suggestion. And even if the word "projected" did allow (or direct) a court to disregard §1325(b)(2)'s fixed formula and to consider other data, there would be no basis in the text for the restrictions the Court reads in, regarding when and to what extent a court may (or must) do so. If the statute authorizes estimations, it authorizes them in *every* case, not just those where changes to the debtor's income are both "significant" and either "known or virtually certain." *Ibid.* If the evidence indicates it is merely more likely than not that the debtor's income will increase by some minimal amount, there is no reading of the word "projected" that permits (or requires) a court to ignore that change. The Court, in short, can arrive at its compromise construction only by

rewriting the statute.

## B

The only reasonable reading that avoids deleting words Congress enacted, or adding others it did not, is this: Setting aside expenses excludable under §1325(b)(2)(A) and (B), which are not at issue here, a court must calculate the debtor's "projected disposable income" by multiplying his current monthly income by the number of months in the "applicable commitment period." The word "projected" in this context, I agree, most sensibly refers to a calculation, prediction, or estimation of future events, see Brief for United States as *Amicus Curiae* 12–13 (collecting dictionary definitions); see also Webster's New International Dictionary 1978 (2d ed. 1957). But one assuredly can calculate, predict, or estimate future figures based on the past. And here Congress has commanded that a specific historical figure shall be the basis for the projection.

The Court rejects this reading as unrealistic. A projection, the Court explains, may be based in *part* on past data, but "adjustments are often made based on other factors that may affect the final outcome." *Ante*, at 7. Past performance is no guarantee of future results. No gambler would bet the farm using "project[ions]" that are based only on a football team's play *before* its star quarterback was injured. And no pundit would keep his post if he "projected" election results relying only on prior cycles, ignoring recent polls. So too, the Court appears to reason, it makes no sense to say a court "project[s]" a debtor's "disposable income" when it considers only what he earned in a specific 6-month period in the past. *Ante*, at 6–7.

Such analogies do not establish that carrying current monthly income forward to determine a debtor's future ability to pay is not a "projection." They show only that relying exclusively on past data for the projection may be a

bad idea. One who is asked to predict future results, but is armed with no other information than prior performance, can still make a projection; it may simply be off the mark. Congress, of course, could have tried to prevent that possibility by prescribing, as it has done in other contexts, that a debtor's projected disposable income be determined based on the "best available evidence," 8 U. S. C. §1364(c)(2), or "any . . . relevant information," 25 U. S. C. §2009(c)(1). But it included no such prescription here, and instead identified the data a court should consider. Perhaps Congress concluded that other information a bankruptcy court might consider is too uncertain or too easily manipulated. Or perhaps it thought the cost of considering such information outweighed the benefits. Cf. 7 U. S. C. §1301(b)(13)(J)–(M) (requiring national and local "projected" yields of various crops to be adjusted only for abnormal weather, trends in yields, and production practices, apparently to the exclusion of other presumably relevant variables such as a sudden increase or decrease in the number of producers, farm subsidies, etc.). In all events, neither the reasons for nor the wisdom of the projection method Congress chose has any bearing on what the statute means.

The Court contends that if Congress really meant courts to multiply a static figure by a set number of months, it would have used the word "multiplied," as it has done elsewhere—indeed, elsewhere in the same subsection, see, *e.g.*, 11 U. S. C. §1325(b)(3)—instead of the word "projected."[2] *Ante*, at 8. I do not dispute that, as a general matter, we should presume that Congress does not ordinarily use two words in the same context to denote the

_____

[2] Of course, since the number of months in the commitment period may vary, Congress could not simply have substituted a single word, but would have had to write "disposable income multiplied by the number of months in the applicable commitment period" or some such phrase.

same thing. But if forced to choose between (A) assuming Congress enacted text that serves no purpose at all, (B) ascribing an unheard-of meaning to the word "projected" (loaded with made-to-order restrictions) simply to avoid undesirable results, or (C) assuming Congress employed synonyms to express a single idea, the last is obviously the least evil.

In any event, we are not put to that choice here. While under my reading a court must determine the *income* half of the "projected disposable income" equation by multiplying a fixed number, that is not necessarily true of the *expenses* excludable under §1325(b)(2)(A) and (B). Unlike the debtor's current monthly income, none of the three types of expenses—payments for the support of the debtor and his dependents, charitable contributions, and expenses to keep an existing business above water—is explicitly defined in terms of historical figures (at least for debtors with incomes below the state median). The first of those cannot possibly (in many cases) be determined based on the same 6-month period from which current monthly income is derived,[3] and the texts of the other two are consistent with determining expenses based on expectations. See §1325(b)(2)(A)(ii) (charitable expenses to qualified entities limited to "15 percent of gross income of the debtor for the year in which the contributions are made"); §1325(b)(2)(B) ("expenditures necessary for the continuation, preservation, and operation" of a business in which the debtor is engaged).

In short, a debtor's projected disposable income consists of two parts: one (current monthly income) that is fixed

---

[3] For a debtor whose income is below the state median, excludable expenses include domestic-support obligations "that first becom[e] payable after the date the petition is filed," §1325(b)(2)(A)(i)—that is, *after* the six-month window relevant to the debtor's current monthly income has closed (unless the debtor does not file a current-income schedule), see §101(10A)(A)(i).

once for all based on historical data, and another (the enumerated expenses) that at least arguably depends on estimations of the debtor's future circumstances. The statute thus requires the court to predict the difference between two figures, each of which depends on the duration of the commitment period, and one of which also turns partly on facts besides historical data. In light of all this, it seems to me not at all unusual to describe this process as projection, not merely multiplication.

## C

The Court's remaining arguments about the statute's meaning are easily dispatched. A "mechanical" reading of projected disposable income, it contends, renders superfluous the phrase "to be received in the applicable commitment period" in §1325(b)(1)(B). *Ante*, at 11. Not at all. That phrase defines the period for which a debtor's disposable income must be calculated (*i.e.*, the period over which the projection extends), and thus the amount the debtor must ultimately pay his unsecured creditors.

Similarly insubstantial is the Court's claim regarding the requirement that the plan provide that the debtor's projected disposable income "will be applied to make payments" toward unsecured creditors' claims, §1325(b)(1)(B). The Court says this requirement makes no sense unless the debtor is actually able to pay an amount equal to his projected disposable income. *Ante*, at 12. But it makes no sense only if one assumes that the debtor is entitled to confirmation in the first place; and that assumption is wrong. The requirement that the debtor pay at least his projected disposable income is a *prerequisite* to confirmation. The "will be applied" proviso does not require a debtor to pay what he cannot; it simply withholds Chapter 13 relief when he cannot pay.

The Court also argues that §1325(b)(1)'s directive to determine projected disposable income "as of the effective

date of the plan" makes no sense if mere multiplication of existing numbers is required. *Ante*, at 11–12. As I have explained, however, "projected disposable income" may in some cases require more than multiplication (as to expenses), and the estimations involved may vary from the date of the plan's filing until the date it takes effect. Moreover, the provision also applies to the alternative avenue to confirmation in §1325(b)(1)(A), which requires that "the value of the property to be distributed under the plan" to an unsecured creditor equals or exceeds the creditor's claim. As to that requirement, the effective-date requirement makes perfect sense.

Text aside, the Court also observes that Circuit practice prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), 119 Stat. 23, aligns with the atextual approach the Court adopts today. *Ante*, at 8–10. That is unsurprising, since the prior version of the relevant provisions was completely consistent with that approach. The Court is correct that BAPCPA "did not amend the term 'projected disposable income,'" *ante*, at 10. But it *did* amend the *definition* of that term. Before 2005, §1325(b)(2) defined "disposable income" simply as "income which is received by the debtor and which is not reasonably necessary to be expended" on the same basic types of expenses excluded by the current statute. §1325(b)(2) (2000 ed.). Nothing in that terse definition compelled a court to rely exclusively on past data, let alone a specific 6-month period. But in BAPCPA—the same Act in which Congress defined "current monthly income" in §101(10A)(A)—Congress redefined "disposable income" in §1325(b)(2) to incorporate that backward-looking definition. See Pub. L. 109–8, §102(b), (h), 119 Stat. 32–34. Given these significant changes, the fact that the Court's approach conforms with pre-BAPCPA practice not only does not recommend it, see *e.g.*, *Pennsylvania Dept. of Public Welfare* v. *Davenport*, 495 U. S. 552, 563–564

(1990), but renders it suspect.

## II

Unable to assemble a compelling case based on what the statute says, the Court falls back on the "senseless results" it would produce—results the Court "do[es] not think Congress intended." *Ante*, at 14. Even if it were true that a "mechanical" reading resulted in undesirable outcomes, that would make no difference. *Lewis* v. *Chicago*, 560 U. S. \_\_\_, \_\_\_ (2010) (slip op., at 11). For even assuming (though I do not believe it) that we could know which results Congress thought it was achieving (or avoiding) apart from the only congressional expression of its thoughts, the text, those results would be entirely irrelevant to what the statute means.

In any event, the effects the Court fears are neither as inevitable nor as "senseless" as the Court portrays. The Court's first concern is that if actual or anticipated changes in the debtor's earnings are ignored, then a debtor whose income increases after the critical 6-month window will not be required to pay all he can afford. *Ante*, at 14. But as Lanning points out, Brief for Respondent 22–23, Chapter 13 authorizes the Bankruptcy Court, at the request of unsecured creditors, to modify the plan "[a]t any time after confirmation" to "increase . . . the amount of payments" on a class of claims or "reduce the time for such payments." §1329(a)(1)–(2) (2006 ed.). The Court offers no explanation of why modification would not be available in such instances, and sufficient to resolve the concern.

The Court also cringes at the prospect that a debtor whose income suddenly *declines* after the 6-month window or who, as in this case, receives a one-off windfall during that window, will be barred from Chapter 13 relief because he will be unable to devote his "disposable income" (which turns on his prior earnings) to paying his unsecured creditors going forward. *Ante*, at 14–15. At least for

debtors whose circumstances deteriorate *after* confirma-
tion, however, the Code already provides an answer.  Just
as a creditor can request an upward modification in light
of postconfirmation developments, so too can a debtor ask
for a downward adjustment.  §1329(a).  Cf. §1329(b)(1)
(requiring that modifications meet requirements of
§§1322(a)–(b), 1323(c), and 1325(a), but not §1325(b)).

   Moreover, even apart from the availability of modifica-
tion it requires little imagination to see why Congress
might want to withhold relief from debtors whose situa-
tions have suddenly deteriorated (after or even toward the
end of the 6-month window), or who in the midst of dire
straits have been blessed (within the 6-month window) by
an influx of unusually high income.  Bankruptcy protec-
tion is not a birthright, and Congress could reasonably
conclude that those who have just hit the skids do not yet
need a reprieve from repaying their debts; perhaps they
will recover.  And perhaps the debtor who has received a
one-time bonus will thereby be enabled to stay afloat.
How long to wait before throwing the debtor a lifeline is
inherently a policy choice.  Congress confined the calcula-
tion of current monthly income to a 6-month period (ordi-
narily ending before the case is commenced), but it could
have picked 2 or 12 months (or a different end date) in-
stead.  Whatever the wisdom of the window it chose, we
should not assume it did not know what it was doing and
accordingly refuse to give effect to its words.

   Even if one insists on making provision for such debtors,
the Court is wrong to write off four alternative strategies
the trustee suggests, Brief for Petitioner 50–54:

   ● Presumably some debtors whose income has only
recently been reduced, or who have just received a jolt that
causes a temporary uptick in their average income, can
delay filing a Chapter 13 petition until their "current
monthly income" catches up with their present circum-
stances.  The Court speculates that delay might "giv[e] the

appearance of bad faith," *ante*, at 15 (citing §1325(a)(7)), but it offers no explanation of why that is so, and no authority supporting it.[4]

&bull; Even if bad faith were a real worry, or if it were essential to a debtor's prospects that he invoke §362's automatic stay immediately, the debtor might ask the bankruptcy court to excuse him from filing a statement of current income, so that it determines his "currently monthly income" at a later date. See §101(10A)(A)(ii). The Court dismisses this alternative, explaining that if the Code requires a mechanical approach this solution would "improperly undermine" it, and if the Code allows exceptions for changed circumstances the solution is unnecessary. *Ante*, at 16. The second premise is correct, but the first is not. Congress does not pursue its purposes at all costs. *Rodriguez* v. *United States*, 480 U. S. 522, 525–526 (1987) *(per curiam)*. Here it may have struck the very balance the Court thinks critical by creating a fixed formula but leaving leeway as to the time to which it applies.[5]

———————

[4] Neither of the two Court of Appeals cases the Court cites—*In re Myers*, 491 F. 3d 120, 125 (CA3 2007), and *Neufeld* v. *Freeman*, 794 F. 2d 149, 153 (CA4 1986)—involved a debtor's delaying his petition until his circumstances would permit the court to confirm a repayment plan.

[5] The Court observes that not every debtor will benefit from this exception, *ante*, at 16, and n. 6, since §521(i)(3) provides that a bankruptcy court may not grant a request (which may be made *after* the deadline for filing the current-income schedule) for an extension of more than 45 days to file such a schedule. But the statute appears to assume that a court may excuse the filing of such a schedule altogether: A debtor is required to file a schedule in the first instance "*unless* the court orders otherwise," §521(a)(1)(B) (emphasis added). And §101(10A)(A)(ii)'s provision of a method for calculating current monthly income "if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii)" makes little sense unless a court can excuse the failure to do so, since an *unexcused* failure to do so would be a basis for dismissing the case, see §521(i). Allowing courts to excuse such schedules does not render superfluous §521(i)(3)'s authori-

● A debtor who learns after filing that he will be unable to repay his full projected disposable income might also be able to dismiss his case and refile it later. §1307(b). The Court worries that this alternative also might be deemed abusive, again with no pertinent authority for the speculation.[6] Its concern is based primarily on its belief that this "circumvents the statutory limits on a court's ability to shift the look-back period." *Ante*, at 16–17. That belief is mistaken, both because the Court exaggerates the statutory limitations on adjusting the look-back period, and because, just as it does not defeat the disposable-income formula's rigidity to allow adjustments regarding the time of determining that figure, it would not undermine the limitations on adjustment applicable in a pending case to allow the debtor to dismiss and refile.[7]

————————

zation for limited extensions, since that applies to extensions sought up to 45 days *after* the filing deadline, whereas §521(a)(1)(B) seems to apply only *before* the deadline.

[6] The sole authority the Court supplies—a single Bankruptcy Court decision predating BAPCPA—provides no support. See *In re Glenn*, 288 B. R. 516, 519–521 (Bkrtcy. Ct. ED Tenn. 2002). Although acknowledging that "[m]ultiple filings by a debtor are not, in and of themselves, improper," the court did note that "whether this is the first or subsequent filin[g]" by the debtor is one among the "totality of the circumstances" to be considered in a good-faith analysis. *Id.*, at 520 (internal quotation marks omitted). The debtor in the case at hand had filed three previous Chapter 13 petitions, "each on the eve of a scheduled foreclosure," and according to the court "never had any intention of following through with any of the Chapter 13 cases," but had used the bankruptcy process "to hold [his creditor] hostage, while remaining in his residence without paying for it." *Id.*, at 520–521.

[7] The Court also notes that the Code precludes a debtor who has had a case pending in the last 180 days from refiling if his prior case was dismissed because he willfully failed to obey the court's orders or to appear before the court, §109(g)(1), or if he voluntarily dismissed the prior suit "following the filing of a request for relief from the automatic stay" under §362, §109(g)(2). *Ante*, at 17, n. 7. But the Court does not explain why these barriers have any bearing on whether refiling for bankruptcy would be abusive when the barriers *do not apply*.

● A debtor unable to pursue any of these avenues to Chapter 13 might still seek relief under Chapter 7. The Court declares this cold comfort, noting that some debtors—including Lanning—will have incomes *too high* to qualify for Chapter 7. *Ante*, at 17–18. Some such debtors, however, may be able to show "special circumstances," §707(b)(2)(B), and still take advantage of Chapter 7. Aside from noting the absence of authority on the issue, the Court's answer is unsatisfyingly circular: It notes that the special-circumstances exception is available only if the debtor has "no reasonable alternative," §707(b)(2)(B)(i), which will not be true after today given the Court's holding that bankruptcy courts can consider changes in a debtor's income. As for those who cannot establish special circumstances, it is hard to understand why there is cause for concern. Congress has evidently concluded that such debtors do not need the last-ditch relief of liquidation, and that they are not suitable candidates for repaying their debts (at least in part) under Chapter 13's protective umbrella. We have neither reason nor warrant to second-guess either determination.

\* \* \*

Underlying the Court's interpretation is an understandable urge: Sometimes the best reading of a text yields results that one thinks must be a mistake, and bending that reading just a little bit will allow all the pieces to fit together. But taking liberties with text in light of outcome makes sense only if we assume that we know better than Congress which outcomes are mistaken. And by refusing to hold that Congress meant what it said, but see *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992), we deprive it of the ability to say what it means in the future. It may be that no interpretation of §1325(b)(1)(B) is entirely satisfying. But it is in the hard cases, even more than the easy ones, that we should faith-

fully apply our settled interpretive principles, and trust that Congress will correct the law if what it previously prescribed is wrong.

I respectfully dissent.